**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Kellie J. Gibson, | No. CV-21-02091-PHX-DWL |
| Plaintiff, | **ORDER** |
| v. | |
| Commissioner of Social Security Administration, | |
| Defendant. | |

Plaintiff challenges the denial of her application for benefits under the Social Security Act ("the Act") by the Commissioner of the Social Security Administration ("Commissioner"). The Court has reviewed Plaintiff's opening brief (Doc. 17), the Commissioner's answering brief (Doc. 18), and Plaintiff's reply (Doc. 19), as well as the Administrative Record (Doc. 13, "AR"), and now reverses the Administrative Law Judge's ("ALJ") decision and remands for further proceedings.

I.   Procedural History

On August 7, 2018, Plaintiff filed an application for disability and disability insurance benefits, alleging disability beginning on July 1, 2018.[1] (AR at 13.) The Social Security Administration ("SSA") denied Plaintiff's application at the initial and reconsideration levels of administrative review and Plaintiff requested a hearing before an ALJ. (*Id.*) On July 14, 2021, following a telephonic hearing, the ALJ issued an

---

[1] Plaintiff's original alleged onset date was August 9, 2017. (AR at 13.) Plaintiff's representative amended the onset date to be July 1, 2018, "reflecting the claimant's date last worked." (*Id.*)

unfavorable decision. (*Id*. at 13-28.) The Appeals Council later denied review.

II.     The Sequential Evaluation Process And Judicial Review

To determine whether a claimant is disabled for purposes of the Act, the ALJ follows a five-step process. 20 C.F.R. § 404.1520(a). The claimant bears the burden of proof on the first four steps, but the burden shifts to the Commissioner at step five. *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999). At the first step, the ALJ determines whether the claimant is presently engaging in substantial gainful activity. 20 C.F.R. §404.1520(a)(4)(i). At step two, the ALJ determines whether the claimant has a "severe" medically determinable physical or mental impairment. 20 C.F.R. § 404.1520(a)(4)(ii). At step three, the ALJ considers whether the claimant's impairment or combination of impairments meets or medically equals an impairment listed in Appendix 1 to Subpart P of 20 C.F.R. Part 404. 20 C.F.R. § 404.1520(a)(4)(iii). If so, the claimant is automatically found to be disabled. *Id.* At step four, the ALJ assesses the claimant's residual functional capacity ("RFC") and determines whether the claimant is still capable of performing past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If not, the ALJ proceeds to the fifth and final step, where she determines whether the claimant can perform any other work in the national economy based on the claimant's RFC, age, education, and work experience. 20 C.F.R. § 404.1520(a)(4)(v). If not, the claimant is disabled. *Id.*

An ALJ's factual findings "shall be conclusive if supported by substantial evidence." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1153 (2019). The Court may set aside the Commissioner's disability determination only if it is not supported by substantial evidence or is based on legal error. *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007). Substantial evidence is relevant evidence that a reasonable person might accept as adequate to support a conclusion considering the record as a whole. *Id.* Generally, "[w]here the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld." *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002) (citations omitted). In determining whether to reverse an ALJ's decision, the district court reviews only those issues raised by the party challenging the

decision.  *Lewis v. Apfel*, 236 F.3d 503, 517 n.13 (9th Cir. 2001).

III.    The ALJ's Decision

The ALJ found that Plaintiff had not engaged in substantial, gainful work activity since the alleged onset date and that Plaintiff had the following severe impairments: "Obesity, aggravating mild degenerative disc disease of the thoracolumbar spine." (AR at 15-16.)  In contrast, the ALJ found that Plaintiff's attention deficit disorder ("ADD") and post-traumatic stress disorder ("PTSD") were non-severe. (*Id*. at 17-20.)[2]  Next, the ALJ concluded that Plaintiff's impairments did not meet or medically equal a listing. (*Id*. at 21.)  Next, the ALJ calculated Plaintiff's RFC as follows:

> [T]he claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) except that while the claimant can frequently climb ramps and stairs, she can only occasionally climb ladders, ropes, and scaffolds.  The claimant can no more than frequently stoop, kneel, crouch, and crawl.

(*Id.* at 21-26.)

As part of this RFC determination, the ALJ evaluated Plaintiff's symptom testimony, concluding that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (*Id.* at 22-24.) The ALJ also evaluated opinion evidence from various medical sources during steps two and four of the sequential analysis, concluding as follows: (1) state agency mental

---

[2] The ALJ also noted that Plaintiff "suffered from a visual impairment, further alleging that she was legally blind without her eyeglasses," but found that subsequent medical examinations showed "the claimant's corrected visual acuity was generally intact at 20/25" and is "capable of reading fine print in twelve-point standard font, with sufficient accuracy that she could independently complete medical forms," such that her alleged vision loss "does not represent a severe impairment." (AR at 16.)  As for Plaintiff's "arthritic hand pain," the ALJ found that "this too appears mild, with no material impact on the claimant's functional capacity" based on "notes from a further check-up at Spectrum Healthcare in January 2021 show[ing] that the claimant's hand pain was reportedly controlled with over-the-counter topical pain medication, and contemporaneous examination notes document[ing] 'no obvious joint deformity.'" (*Id.*)  Finally, as for Plaintiff's alleged "periodontal disease leading to missing teeth," the ALJ concluded this impairment was non-severe in light of Plaintiff's clear communication during the hearing and the absence of evidence of "recurrent dental abscesses or dental abscesses progressing into generalized infection or sepsis." (*Id.* at 16-17.)

consultant Dr. M. Meier, PsyD ("generally persuasive"); (2) state agency mental consultant Dr. R. Garland, PhD ("generally persuasive"); (3) consultative examiner Dr. Kenzslowe ("only partially persuasive"); (4) consultative examiner Dr. Tromp ("generally persuasive"); (5) Registered Nurse Dena Wampler ("unpersuasive"); (6) state agency medical consultant Pravin Sampat, M.D. ("persuasive"); (7) state agency medical consultant J. Hartman, M.D. ("persuasive"); (8) Richard Palmer, M.D., who performed a medical consultative examination of Plaintiff ("generally persuasive"); and (9) Nurse Practitioner Claudia Converse ("unpersuasive," "poorly supported," and "inconsistent with the evidence of record"). (*Id.* at 18-20, 23-26.) Additionally, the ALJ evaluated a third-party statement from Mary Wisely, Plaintiff's mother, but made "no specific finding as to the persuasiveness of this evidence." (*Id.* at 26.)

Based on the testimony of a vocational expert, the ALJ concluded that Plaintiff was capable of performing her past relevant work as a graphic designer, data entry clerk, and instant print operator. (*Id.* at 27.) Thus, the ALJ concluded that Plaintiff is not disabled. (*Id.* at 28.)

IV.    Discussion

Plaintiff presents two issues on appeal: (1) "Did the ALJ commit materially harmful error by rejecting Gibson's symptom testimony in the absence of specific, clear, and convincing reasons supported by substantial evidence in this record as a whole?" (Doc. 17 at 10-17); and (2) "Did the ALJ commit materially harmful error by concluding Gibson's mental impairments were not severe, which was founded on the ALJ's improper rejection of the assessment from Gibson's treating psychiatric nurse practitioner, Dena R. Wampler, PMHNP-BC, without providing sufficient explanation that included a rational interpretation of this record supported by substantial evidence that also failed to explain the consideration of the supportability and consistency factors under the agency's regulations for evaluation of medical source opinions?" (*id.* at 17-25).

…

…

- 4 -

A. **Symptom Testimony**

1. Standard Of Review

An ALJ must evaluate whether the claimant has presented objective medical evidence of an impairment that "could reasonably be expected to produce the pain or other symptoms alleged." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007) (citations omitted). If so, "an ALJ may not reject a claimant's subjective complaints based solely on a lack of medical evidence to fully corroborate the alleged severity of pain." *Burch v. Barnhart*, 400 F.3d 676, 682 (9th Cir. 2005). Instead, the ALJ may "reject the claimant's testimony about the severity of [the] symptoms" only by "providing specific, clear, and convincing reasons for doing so." *Brown-Hunter v. Colvin*, 806 F.3d 487, 488-89 (9th Cir. 2015). This is the most demanding standard in Social Security cases. *Garrison v. Colvin*, 759 F.3d 995, 1015 (9th Cir. 2014).

2. The ALJ's Evaluation Of Plaintiff's Symptom Testimony

The ALJ provided the following analysis of Plaintiff's mental symptom testimony:

> In her Adult Function Report, the claimant alleged deficits in her memory, reportedly severe enough that she had difficulty remembering spoken instructions. In terms of the evidence, notes from a September 2018 psychological consultative examination with Dr. Angela Kenzslowe, PsyD, show that the claimant performed well on exercises testing her cognitive function, scoring two out of three possible points on a delayed recall exercise, and receiving full scores on immediate recall, naming, repetition, comprehension, reading, writing, and copying exercises. Shortly thereafter, in February 2019, the claimant attended a further consultative examination with Dr. Shannon Tromp, PhD, receiving a perfect score on exercises testing her recall and general cognition. More recently, notes from a brief January 2021 hospitalization at the Banner Behavioral Health Hospital show that the claimant's memory remained grossly intact even during a period of increased symptom severity, with coherent, goal-directed thought processes. Finally, notes from a March 2021 mental status examination at the Cobre Valley Regional Medical Center show that the claimant again displayed grossly intact memory and cognition, with good insight and judgment. Accordingly, the undersigned finds that the claimant remains able to function in this area without limitation. . . .
>
> In her Adult Function Report, the claimant alleged difficulties with concentration and task completing, stating that her ability to pay attention "depends entirely on level of interest." However, during the claimant's initial psychological consultative examination, Dr. Kenzslowe indicated that the claimant scored five out of five possible points on exercises testing attention and calculation. Likewise consultative examiner Dr. Tromp indicated that the claimant had "no problems" with attention and concentration, again noting that the claimant scored five out of five possible

> points on exercises testing attention and calculation. Despite the claimant's episode of increased mental symptom severity in January 2021, notes from an evaluation at Crisis Preparation and Recovery show that her attention remained normal, with the claimant successfully completing serial-sevens calculations and spelling the word "world" both forwards and backwards. Similarly, records from the claimant's most recent mental status examination at the Cobre Valley Regional Medical Center show that her attention and concentration remained grossly intact despite her anxious mood, suggesting that the claimant's anxiety does not represent a significant barrier to her ability to maintain concentration. With this in mind, the undersigned finds that the claimant is only mildly limited in this functional area. . . .
>
> As for her interaction with others, the file documents intermittent complaints of difficulty getting along with others, centered on feelings of persecution, but the majority of examination notes characterize the claimant's demeanor as generally normal. Notably, both Dr. Kenzslowe and Dr. Tromp characterized the claimant's demeanor as cooperative, with normal speech, as do notes from the claimant's January 2021 discharge examination at the Banner Behavioral Health Hospital. Indeed, as recently as March 2021, records from the Cobre Valley Regional Medical Center show that the claimant remained calm, with appropriate eye contact despite an anxious mood. As such, the undersigned finds that the claimant's limitation in these functional areas remains mild. . . .

(AR at 17-18, internal citations omitted.)

Separately, the ALJ provided the following summary of Plaintiff's physical symptom testimony:

> In her initial Adult Disability Report, the claimant alleged that she was unable to work due to arthritic pain in her back, with additional limitations stemming from the nonsevere physical and mental impairments already addressed earlier in this decision. In her request for reconsideration, the claimant alleged an increase in her symptom severity in Autumn 2018, interfering with activities of daily living, later alleging a further increase in symptom severity in her request for a hearing. The claimant elaborated on these allegations in her Adult Function Report, stating that she could walk no more than one-quarter mile at a time, further alleging unspecified limitations in standing, walking, sitting, and a wide range of flexibility-related activities. During the hearing, the claimant testified that she continued to struggle with chronic pain, interfering with physical abilities. In general, the claimant's allegations represent a high degree of limitation that would substantially interfere with the performance of work-related tasks on a regular basis. . . .

(*Id.* at 22.)

The ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." Nevertheless, the ALJ declined to fully credit this testimony because Plaintiff's "statements concerning the intensity,

persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (*Id.*)  In support of this conclusion, the ALJ cited (1)  medical records showing that Plaintiff's "present complaints appear to pre-date the period at issue here"; (2) treatment records showing that Plaintiff "exhibited a normal gait, with full 5/5 motor strength, intact sensation, and negative straight-leg raising test results" on several occasions; (3) Plaintiff's yard work and independence in her daily activities; (4) other medical records noting normal objective examinations; and (5) treatment notes in which Plaintiff denied debilitating symptoms like "weakness, fatigue, or disequilibrium." (*Id.* at 22-24.)

   3. <u>The Parties' Arguments</u>

  Plaintiff raises several challenges to the ALJ's evaluation of her symptom testimony. (Doc. 17 at 10-17.)  First, Plaintiff argues that it was error for the ALJ to only discuss her mental impairments at step two. (Doc. 17 at 12.)  Second, Plaintiff faults the ALJ for not mentioning her bipolar diagnosis. (*Id.*)  Third, Plaintiff argues that the ALJ "discounted [her] reported mental health symptoms based on mental status examinations showing normal cognitive functioning, including intact memory," which misunderstands "the nature of [Plaintiff's] mental impairments" given that cognitive assessments are not the equivalent of a depressive disorder. (*Id.* at 12-13.)  Fourth, Plaintiff argues that her scores on "quick questions during a time-limited examination do[] not forecast how [she] would be able to perform or sustain work over an eight-hour day, forty-hour week." (*Id.* at 13.)  Fifth, in a related vein, Plaintiff argues that the ALJ's reliance on treatment notes describing Plaintiff as "awake, alert, fully oriented, or with a 'generally normal' demeanor, does not show any convincing inconsistency" with Plaintiff's reported symptoms. (*Id.* at 14.) Sixth, as for her physical pain, Plaintiff argues the ALJ mischaracterized the timeline of her low back pain—specifically, by finding that "her pain complaints existed prior to her onset date of disability, and had not progressed during the period at issue" despite medical records showing physical therapy in 2020. (*Id.*)  Plaintiff also contends that any

isolated treatment notes do not consider her pain in the context of an eight-hour workday. (*Id.* at 15.) Finally, Plaintiff argues that the ALJ's finding that her yard work was inconsistent with her limitations was flawed given that there is no evidence that she spent a "*substantial part of a typical day*" engaged "in activities inconsistent with disabling limitations." (*Id.* at 15-16, citing *Vertigan v. Halter*, 260 F.3d 1044, 1049-50 (9th Cir. 2001).)

The Commissioner argues that substantial evidence supports the ALJ's assessment of Plaintiff's subjective allegations. (Doc. 18 at 5.) The Commissioner contends that the ALJ identified three reasons for rejecting Plaintiff's symptom testimony: (1) the testimony was inconsistent with the medical evidence in the record; (2) Plaintiff responded well to treatment; and (3) Plaintiff's activities of daily living contradicted her subjective allegations. (*Id.* at 5-10, 13-16.) Although the ALJ did not mention Plaintiff's bipolar diagnosis, the Commissioner argues that Plaintiff's bipolar disorder is limited to "Plaintiff's five days of treatment in January 2021" and, in any event, "the ALJ specifically considered Plaintiff's reported mental health symptoms throughout the relevant period," so any error would be harmless. (*Id.* at 11.) Related to Plaintiff's physical impairments, the Commissioner argues the objective medical evidence cited by the ALJ directly contradicts Plaintiff's claimed limitations. (*Id.* at 11-13.)

In reply, Plaintiff accuses the Commissioner of not materially responding to her arguments and merely repeating the ALJ's rationale. (Doc. 19 at 4-5, 7.) Plaintiff also argues that any improvement analysis offered by the Commissioner is a *post hoc* rationale. (*Id.* at 5-6.) Plaintiff further contends that improvement in some symptoms does not negate her "ongoing issues with paranoid thought content, concentration deficiencies, or social interaction difficulties." (*Id.* at 6.) Plaintiff also notes that the Commissioner does not "defend the ALJ's failure to demonstrate that [Plaintiff] spent a substantial part of a typical day engaged in activities inconsistent with disabling limitations, or that a list of activities, without information as to the demands, frequency, or duration of those activities, failed to show any contradiction with [Plaintiff's] reported symptoms." (*Id.* at 7.)

4. <u>Analysis</u>

The Court finds no harmful error in the ALJ's decision to discredit Plaintiff's symptom testimony.

As an initial matter, there is no merit to Plaintiff's contention that the ALJ failed to discuss her mental impairments with any specificity. In support of this contention, Plaintiff cites the portion of the decision containing the ALJ's step-four analysis. (Doc. 17 at 11.) But it is error for a reviewing Court to confine its analysis to one heading. *Kaufmann v. Kijakazi*, 32 F.4th 843, 851 (9th Cir. 2022) ("We agree with the Commissioner and the court that, in its original decision, the court clearly erred by overlooking the ALJ's full explanation."); *Kennedy v. Colvin*, 738 F.3d 1172, 1178 (9th Cir. 2013) (an ALJ is required to "discuss and evaluate the evidence that supports his or her conclusion," but is not required to do so under a specific heading). As noted above, the ALJ provided a comprehensive discussion of Plaintiff's claimed mental impairments during step two of the sequential analysis. (AR at 17-19.) Then, during step four, with respect to both Plaintiff's physical and mental impairments, the ALJ found "that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (AR at 22.)

During the step-two analysis, the ALJ identified several clear and convincing reasons, supported by substantial evidence, for discounting Plaintiff's testimony related to her alleged mental impairments. For example, although Plaintiff "alleged deficits in her memory, reportedly severe enough that she had difficulty remembering spoken instructions," the ALJ correctly noted that Plaintiff performed "well on exercises testing her cognitive function, scoring two out of three possible points on a delayed recall exercise, and receiving full scores on immediate recall, naming, repetition, comprehension, reading, writing, and copying exercises." (AR at 17-18, citing *id.* at 440, 674.) Although Plaintiff is correct that such test results do not *always* contradict a claimant's allegations regarding

mental symptoms,³ it was rational for the ALJ to conclude they contradicted Plaintiff's specific allegations related to memory deficits.

Similarly, although Plaintiff asserted that her ability to pay attention "depends entirely on level of interest" (AR at 440), the ALJ correctly noted that, during examinations by the agency consultants, Plaintiff scored "five out of five possible points on exercises testing attention and calculation." (AR at 17-18, citing AR at 674, 680.) Other records indicate that Plaintiff completed "counting backwards from 100 in increments of 7" as well as certain spelling exercises. (*Id.* at 18, citing *id.* at 871.) Separately, a note from a medical appointment showed that Plaintiff's attention was "grossly intact" despite her anxious mood, "suggesting that the claimant's anxiety does not represent a significant barrier to her ability to maintain concentration." (*Id.* at 18, citing *id.* at 937.) It was rational for the ALJ to conclude that these objective findings contradicted Plaintiff's stated limitations in the area of "concentrating, persisting, or maintaining pace."

Although these proffered reasons for discounting Plaintiff's symptom testimony would alone be sufficient to reject Plaintiff's first assignment of error,⁴ and although Plaintiff clarifies that her first assignment of error "focuses on [her] mental impairments"

---

³ *See generally Ghanim v. Colvin*, 763 F.3d 1154, 1164 (9th Cir. 2014) ("[T]he ALJ's reliance on Dr. McDuffee and Dr. Dees's observations about cognitive functioning is misplaced; Ghanim primarily testified that nightmares, insomnia, social anxiety, and depression—not any cognitive impairments—caused him difficulty."); *Morris v. Berryhill*, 358 F. Supp. 3d 875, 882-83 (D. Ariz. 2019) ("[T]he MMSE does measure cognitive function, as the ALJ indicated. But, plaintiff's limitations flow from her schizoaffective disorder and her depressive disorder, not from any cognitive disorder. . . . Similarly, observations as to plaintiff's cognitive functioning do not contradict her reported symptoms of depression and hearing voices. The limitations that Dr. Koster assessed were not limited to cognition issues, but included limitations that flowed from plaintiff's depressive and schizoaffective disorders. The second reason the ALJ gave for rejecting Dr. Koster's opinion was not legitimate.") (citation omitted).

⁴ *See, e.g., Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012) ("[S]everal of our cases have held that an ALJ's error was harmless where the ALJ provided one or more invalid reasons for disbelieving a claimant's testimony, but also provided valid reasons that were supported by the record."); *Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1162-63 (9th Cir. 2008) ("Because we conclude that two of the ALJ's reasons supporting his adverse credibility finding are invalid, we must determine whether the ALJ's reliance on such reasons was harmless error. . . . [T]he relevant inquiry in this context is not whether the ALJ would have made a different decision absent any error, it is whether the ALJ's decision remains legally valid, despite such error. . . . Here, the ALJ's decision finding Carmickle less than fully credible is valid, despite the errors identified above.").

(Doc. 17 at 14), the Court also notes that the ALJ identified clear and convincing reasons, supported by substantial evidence, for discrediting Plaintiff's testimony related to her physical impairments. For example, the ALJ noted (AR at 22) that Plaintiff's complaints of chronic back pain, which she identified in her Disability Report as one of her disabling impairments (AR at 416), are reflected in medical records dating back to early 2018. (*See, e.g.*, *id.* at 622 [May 2018 medical record, reflecting that Plaintiff's chief complaint was "Low back pain and numbness in left leg" and that Plaintiff had been "referred by her primary care[,] complains of chronic low back pain"]; *id.* at 599-600 [radiology records from February 2018 reflecting "mild multilevel degenerative disease and fact arthropathy with multiple levels of mild spondylolisthesis seen in the lower cervical spine"].) However, Plaintiff proceeded before the ALJ under the theory that "the alleged onset date of her disability [was] July 1, 2018, reflecting [her] last date worked." (AR at 13.) This chronology is potentially significant because it suggests that Plaintiff was able to work during the first half of 2018 despite the purportedly disabling impairment. Under Ninth Circuit law, such an inconsistency may serve as a permissible basis for discrediting a claimant's symptom testimony. *See, e.g.*, *Miller v. Berryhill*, 732 F. App'x 526, 528 (9th Cir. 2018) ("The ALJ also reasoned that Miller's testimony was undercut by the fact that he had worked before the alleged onset date with approximately the same impairments, as evidenced by medical imaging showing no change to his lumbar spine or the surgery site from before the alleged onset date to afterward, as well as various range-of-motion and pain tests that remained the same before and after the alleged onset date. This was permissible."); *Alexander v. Comm'r of Soc. Sec.*, 373 F. App'x 741, 744 (9th Cir. 2010) ("The ALJ did not err in disregarding Alexander's alleged fibromyalgia as disabling. . . . Dr. Emori diagnosed fibromyalgia in 1989, seven years before Alexander's alleged onset date. In the interim, Alexander was able to work.") (citations omitted).[5] It was rational for

---

[5] The Court acknowledges that an adverse credibility determination may not be warranted if the preexisting condition "worsened or deteriorated in some way to distinguish the period before [the] alleged onset date from after that date." *Schoonmaker v. Colvin*, 2015 WL 6658669, *6 (D. Or. 2015). However, it was rational for the ALJ to conclude that no such worsening or deterioration occurred here. (AR at 23 ["Overall, while the file documents the presence of degenerative disc disease in the claimant's thoracolumbar spine,

the ALJ to identify this discrepancy as one of the bases for discrediting Plaintiff's testimony.

Separately, although Plaintiff asserted in her Function Report that her back and knee pain impair her ability to stand, walk, and squat (AR at 440), the ALJ identified numerous examples of Plaintiff walking without difficulty. (*Id.* at 24, citing *id.* at 584, 596, 624, 629, 664, 673, 833, 846, 850, 854, 857, 871, 881, 944.)[6] Plaintiff's citation to one physical therapy session in 2020 does not undermine the ALJ's conclusion. (Doc. 17 at 14, citing AR at 836-59.) Therefore, the ALJ did not err in discrediting Plaintiff's symptom testimony.

B. **NP Wampler's Opinions**

1. Standard Of Review

In January 2017, the SSA amended the regulations concerning the evaluation of medical opinion evidence. *See Revisions to Rules Regarding Evaluation of Medical Evidence*, 82 Fed. Reg. 5844 (Jan. 18, 2017). Because the new regulations apply to applications filed on or after March 27, 2017, they are applicable here.

The new regulations, which eliminate the previous hierarchy of medical opinions, provide in relevant part as follows:

> We will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources . . . . The most important factors we consider when we evaluate the persuasiveness of medical opinions and prior administrative medical findings are supportability . . . and consistency . . . .

---

this impairment appears to have remained mild during the period at issue here, without evidence of any significant disease progression."].) The only purported evidence of worsening identified by Plaintiff is that she participated in physical therapy sessions in May 2020 for her back pain (Doc. 17 at 3 n.3, 14), but the notes from those physical therapy sessions reflect the same general complaints that Plaintiff raised during medical appointments before the alleged onset date. (*Compare* AR at 836 [May 2020 record: "Primary diagnosis: Low back pain"] with AR at 622 [May 2018 medical record, reflecting that Plaintiff's chief complaint was "Low back pain and numbness in left leg" and that Plaintiff had been "referred by her primary care[,] complains of chronic low back pain"].)

[6] The Court notes that several of the records cited by the ALJ do not appear to exist. (*Compare* AR at 24 [citing "12F/9, 13, 17, 20"] *with* AR at 687-88 [Exhibit 12F is a two-page document].)

20 C.F.R. § 416.920c(a).[7]  Regarding the "supportability" factor, the new regulations explain that the "more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s), . . . the more persuasive the medical opinions . . . will be." *Id.* § 404.1520c(c)(1).  Regarding the "consistency" factor, the "more consistent a medical opinion(s) . . . is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) . . . will be." *Id.* § 404.1520c(c)(2)

Recently, the Ninth Circuit confirmed that the "recent changes to the Social Security Administration's regulations displace our longstanding case law requiring an ALJ to provide 'specific and legitimate' reasons for rejecting an examining doctor's opinion." *Woods v. Kijakazi*, 32 F.4th 785, 787 (9th Cir. 2022).  Thus, "the former hierarchy of medical opinions—in which we assign presumptive weight based on the extent of the doctor's relationship with the claimant—no longer applies.  Now, an ALJ's decision, including the decision to discredit any medical opinion, must simply be supported by substantial evidence." *Id.*  With that said, "[e]ven under the new regulations, an ALJ cannot reject an examining or treating doctor's opinion as unsupported or inconsistent without providing an explanation supported by substantial evidence.  The agency must articulate how persuasive it finds all of the medical opinions from each doctor or other source and explain how it considered the supportability and consistency factors in reaching these findings." *Id.* at 792 (cleaned up).  Although an "ALJ can still consider the length and purpose of the treatment relationship, the frequency of examinations, the kinds and extent of examinations that the medical source has performed or ordered from specialists, and whether the medical source has examined the claimant or merely reviewed the claimant's records . . . the ALJ no longer needs to make specific findings regarding these relationship factors . . . ." *Id.*

---

[7]  In addition to supportability and consistency, other factors that may be considered by the ALJ include the provider's relationship with the claimant, the length of the treatment relationship, the frequency of examinations, the purpose and extent of the treatment relationship, and the specialization of the provider.  20 C.F.R. § 416.920c(c).

### 2. NP Wampler's Opinions

NP Wampler, a consultive medical examiner, examined Plaintiff and then filled out an undated form entitled "Medical Assessment of Claimant's Ability to Perform Work Related Activities (Mental)." (AR at 687-88.) The form contained several questions with accompanying rating scales. (*Id.*) NP Wampler indicated that Plaintiff had a "moderate" impairment in her ability to relate to other people; a "mild" restriction in her daily activities; a "moderate" deterioration in personal habits; and a "moderately severe" constriction of interests. (*Id.* at 687.) Based on these findings, NP Wampler indicated that Plaintiff had "moderate" limitations in her ability to respond appropriately to supervision or co-workers and a "moderately severe" limitation in her ability to respond to customary work pressures. (*Id.*) On the second page of the form, NP Wampler indicated that Plaintiff's limitations would be expected to last more than 12 months and would moderately[8] affect Plaintiff's sustainability of work pace. (*Id.* at 688.) In making these determinations, NP Wampler indicated that she reviewed her own "treatment notes" but "no other documents." (*Id.*)

### 3. The ALJ's Evaluation Of NP Wampler's Opinions

The ALJ concluded that NP Wampler's opinions were "unpersuasive." (AR at 20.) The ALJ's complete rationale was as follows:

> [T]he opinions of registered nurse Dena Wampler are unpersuasive. In an undated medical source statement, Ms. Wampler opined that the claimant was subject to "moderately severe" constriction of interests and ability to respond to customary work pressures, with "moderate" limitations in her ability to respond appropriately to supervisors and coworkers, as well as moderate deterioration in personal habits and moderate impairment in her ability to relate to other people. However, Ms. Wampler presented her opinions in a mere check box form, with no references to supporting evidence or even a basic articulation of her rationale for these proposed limitations. Aside from this issue of supportability, examination notes appearing elsewhere in the file point to a considerably more mild set of mental symptoms than Ms. Wampler's opinions would suggest. Most notably, the claimant exhibited a generally normal mental status during both of her psychological consultative examinations, and while she experienced a brief

---

[8] As defined in the form, moderate means off task between "11-15% of an 8-hour work day." (AR at 688.)

episode of mental symptom exacerbation in January 2021 after discontinuing prescribed medications, her mental status stabilized rapidly upon resumption of treatment. Since then, new examination notes from as recently as March 2021 show that the claimant remained calm despite a reportedly anxious mood, with no deficits in memory, cognition, attention, concentration, insight, or judgment. In view of the claimant's generally normal mental status upon examination, the undersigned finds Ms. Wampler's opinions overly restrictive relative to the totality of the evidence, and sets these opinions aside as unpersuasive.

(*Id.*)

### 4. The Parties' Arguments

Plaintiff argues that the ALJ "committed materially harmful error" when discrediting the opinions of NP Wampler. (Doc. 17 at 17-25.) More specifically, Plaintiff argues that the ALJ's rejection of NP Wampler's assessment was without "sufficient explanation" and did not include "consideration of the supportability and consistency factors." (*Id.* at 17.) According to Plaintiff, the ALJ relied on "*unrelated* normal cognitive findings to support a perceived inconsistency between the medical evidence and [Plaintiff's] reported mental symptoms" even though the record shows "consistent mental health treatment . . . and a psychiatric hospitalization after a suicide attempt." (*Id.*) Plaintiff argues that NP Wampler's assessment should be upheld, even under the new regulations, given NP Wampler's treatment relationship with Plaintiff. (*Id.* at 21.) Plaintiff also contends that NP Wampler's treatment notes, which were included in the record, provide an adequate rationale for her check-box-form assessments. (*Id.* at 21-22.) Next, Plaintiff argues that the ALJ "conflated the supportability and consistency factors" and that the ALJ did not "*articulate* and *explain*" her rationale for valuing the consultative medical examiner's opinions over those of NP Wampler. (*Id.* at 23.) Finally, Plaintiff contends that her January 2021 hospitalization (admittedly due to stopping medication) is not inconsistent with her mental disorder symptoms. (*Id* at 23-24.)

The Commissioner defends the sufficiency of the ALJ's rationale for discrediting the opinions of NP Wampler. (Doc. 18 at 17-24.) According to the Commissioner, the ALJ permissibly found that NP Wampler's opinions could be discredited under both the

"consistency" and "supportability" factors. (*Id.* at 20-23.) The Commissioner emphasizes that the "check box" nature of NP Wampler's assessment is unpersuasive because of the lack of explanation and notes that an ALJ may permissibly discredit a medical source's opinions on this basis under the new regulations and recent Ninth Circuit case law. (*Id.* at 20-21.) As for Plaintiff's arguments regarding the clear-and-convincing-reasons standard and NP Wampler's status as a treating source, the Commissioner contends these arguments are premised on outdated regulations. (*Id.* at 21.) The Commissioner also contends that an examination of NP Wampler's underlying treatment notes does not "contradict the ALJ's supportability analysis." (*Id.* at 21-22.) Finally, as for the ALJ's consistency analysis, the Commissioner argues that ALJ provided a substantial explanation in various portions of the order and Plaintiff's "remaining arguments improperly ask this Court to reconsider the evidence that the ALJ already properly evaluated." (*Id.* at 23-24.)

In reply, Plaintiff acknowledges that the specific-and-legitimate-reasons standard is no longer applicable in light of *Woods*. (Doc. 19 at 10.) Nevertheless, Plaintiff argues that the ALJ's evaluation of NP Wampler's opinions remains erroneous because (1) "this record demonstrated that her mental symptoms and limitations caused more than a minimal effect on her ability to sustain work" and (2) "[t]he Commissioner's response again stressed improper post hoc rationale related to improvement as a perceived inconsistency between the medical evidence and [Plaintiff's] reported mental symptoms." (*Id.* at 9-10.)

     5. <u>Analysis</u>

The Court understands Plaintiff's argument to be that (1) the ALJ erred when discrediting NP Wampler's opinions and (2) the error was harmful because it caused Plaintiff's mental impairments to be designated as non-severe. (Doc. 17 at 17 ["The ALJ committed materially harmful error by concluding Gibson's mental impairments were not severe, which was founded on the ALJ's improper rejection of NP Wampler's assessment without providing sufficient explanation that included a rational interpretation of this record supported by substantial evidence that also failed to explain the consideration of the supportability and consistency factors under the agency's regulations for evaluation of

medical source opinions."].)

On the one hand, Plaintiff's focus on how Plaintiff's mental impairments were characterized at step two of the sequential analysis is misplaced. To proceed beyond step two, the claimant must have a severe impairment, or a combination of severe impairments, that "significantly limits [her] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). "An impairment is not severe if it is merely 'a slight abnormality (or combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities.'" *Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005) (citations omitted). Notably, "[s]tep two is merely a threshold determination meant to screen out weak claims." *Buck v. Berryhill*, 869 F.3d 1040, 1048 (9th Cir. 2017) (citation omitted). Because the ALJ must evaluate the functional impact of both severe and non-severe impairments during later steps, "[t]he RFC . . . should be exactly the same regardless of whether certain impairments are considered 'severe' or not." *Id*. at 1049 (emphasis omitted).

Given these principles, to the extent Plaintiff's argument is that the ALJ erred by failing to categorize her mental impairments as severe for step-two purposes (Doc. 17 at 17-19), reversal is not warranted. "As this Court has observed in earlier cases, Ninth Circuit law is not a model of clarity concerning how to evaluate claims of step-two error. Some cases suggest that, although it is error for an ALJ to fail to characterize a particular impairment as 'severe' during step two, the error can be disregarded as harmless if the ALJ properly addresses the impairment during later steps. Other decisions suggest that a claimant can't complain about an ALJ's failure to identify a particular impairment as 'severe' during step two so long as the ALJ determined the claimant also had other impairments that so qualify. At any rate, the dispositive issue is whether the ALJ properly evaluated the evidence and testimony concerning that condition during later steps and factored that condition into the RFC." *Harvey v. Comm'r of Soc. Sec. Admin.*, 2021 WL 5822641, *2 (D. Ariz. 2021) (cleaned up). Accordingly, the dispositive issue here is whether Plaintiff has established the existence of harmful error with respect to the ALJ's

consideration of her mental impairments during later steps. The dispute over the step-two severity characterization is a red herring. *Buck*, 869 F.3d at 1049 ("[S]tep two was decided in Buck's favor . . . . He could not possibly have been prejudiced. Any alleged error is therefore harmless and cannot be the basis for a remand.").

On the other hand, Plaintiff has established that the ALJ committed harmful error when evaluating NP Wampler's opinions. Although the ALJ followed the correct procedure under the new regulations when conducting that evaluation (*i.e.*, considering the supportability and consistency factors), the resulting conclusions are not supported by substantial evidence. The ALJ concluded that NP Wampler's opinions could be discredited under the supportability factor because the opinions were presented in a "mere check box form, *with no references to supporting evidence* or even a basic articulation of her rationale for these proposed limitations." (AR at 20, emphasis added.) The italicized portion of this passage is factually inaccurate—the form indicates that NP Wampler reviewed her "own treatment notes" in making her assessments. (AR at 688.) Indeed, Plaintiff identifies nine treatment notes by NP Wampler that are included in the record. (Doc. 17 at 3-6, citing AR at 650 [5/30/18], 654-56 [8/22/18], 797-98 [12/3/18], 799 [3/1/19], 800 [4/11/19], 801 [5/10/19], 802 [8/15/19], 804 [1/15/2020], 805 [4/22/20].) Several relate to the substance of Plaintiff's testimony. (*See, e.g.*, AR at 650 ["She left work d/t a couple of women targeting her at work, examples were when one yelled at her in front of guests, the other has been lying to pt and other co-workers. She decided she would not be able to go back to work until she is back on her meds. She will become upset and 'not be able to pull myself together.'"].) There is no indication the ALJ was aware of these notes, let alone considered them as part of the supportability analysis. This was error. And although the Commissioner attempts to provide reasons why the ALJ *could* have found that NP Wampler's opinions were not supported by NP Wampler's treatment notes, this is the sort of *post hoc* rationale that is impermissible in the Social Security context. *Burrell v. Colvin*, 775 F.3d 1133, 1138 (9th Cir. 2014) ("We are constrained to review the reasons the ALJ asserts.").

The Court acknowledges that the ALJ also found that NP Wampler's opinions could be discredited under the consistency factor. This determination, when viewed in isolation, was arguably supported by substantial evidence—although Plaintiff argues that the "ALJ did not cite to any specific notes from other providers that painted a 'more mild set of mental limitations'" (Doc. 17 at 22), this accusation overlooks that the ALJ provided a thorough analysis of both Dr. Kenslowe's and Dr. Tromp's evaluations during the step-two analysis. (AR at 17-20.)[9] Nevertheless, the Court cannot conclude (at least under the somewhat unusual circumstances of this case) that the ALJ's permissible finding as to the consistency factor renders harmless the ALJ's error as to the supportability factor. Perhaps the ALJ will conclude on remand that NP Wampler's opinions are not supported by her treatment notes or that NP Wampler's opinions are unworthy of credence (despite their supportability) due to their inconsistency with other medical records and the opinions of other medical sources. But these are determinations the ALJ should make in the first instance.

C. **Remedy**

Plaintiff asks that the Court apply the "credit-as-true" rule, which would result in the remand of Plaintiff's case for calculation of benefits rather than for further proceedings. (Doc. 17 at 25.)

The credit-as-true rule only applies in "rare circumstances." *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1099-1102 (9th Cir. 2014). Such rare circumstances arise when three elements are present. First, the ALJ must have failed to provide legally sufficient reasons for rejecting medical evidence or claimant testimony. *Id.* at 1100. Second, the record must be fully developed, there must be no outstanding issues that must be resolved before a determination of disability can be made, and the Court must find that further administrative proceedings would not be useful. *Id.* at 1101. Further proceedings are considered useful when there are conflicts and ambiguities that must be resolved. *Id.*

---

[9] Plaintiff also argues that the ALJ did not evaluate Plaintiff's bipolar disorder under both issue headings. (Doc. 17 at 18, 24.) However, Plaintiff did not seek a disability determination on the basis of bipolar disorder. (AR at 416.)

Third, the Court must "find[] the relevant testimony credible as a matter of law . . . and then determine . . . the record, taken as a whole, leaves 'not the slightest uncertainty as to the outcome of [the] proceeding.'" *Id.* (citations omitted). Also, even if all elements of the credit-as-true rule are met, the Court maintains "flexibility to remand for further proceedings when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act." *Garrison*, 759 F.3d at 1021.

The credit-as-true rule is inapplicable here. Although the ALJ failed to provide legally sufficient reasons for rejecting the opinions of NP Wampler, outstanding issues must be resolved before a determination of disability can be made (*e.g.*, whether to credit NP Wampler's opinions in light of the existence of NP Wampler's treatment notes). Further administrative proceedings would be useful for the same reason. *Cf. Harvey v. Kijakazi*, 2023 WL 21462, *1 (9th Cir. 2023) (affirming that the credit-as-true rule was inapplicable where the ALJ mistakenly overlooked certain evidence: "remanding for further proceedings is appropriate to allow the ALJ to properly consider the evidence in the first instance").

Accordingly,

**IT IS ORDERED** that the decision of the ALJ is **reversed** and this case is **remanded** for further proceedings. The Clerk shall enter judgment accordingly and terminate this action.

Dated this 20th day of March, 2023.

Dominic W. Lanza
United States District Judge